[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiffs Roy and Constance Champagne are the owners of a parcel of land in Granby which does not have access by way of a town road. The parcel is bounded to the east and the south by land of the defendants[1]. Moosehorn Road, a town road, extends through the defendant's land, but ends short of the Champagne property. The relevant facts of this case are devoted mostly to the efforts of the plaintiff[2] to provide access to the parcel via extensions of Moosehorn Road. CT Page 16088
The Champagnes purchased their parcel in 1977. It was noted on the deed that "[a]n old highway runs through the property." The "old highway", according to maps entered into evidence, is a disused extension of Moosehorn Road. Prior to the events forming the basis of this action, Moosehorn Road ended approximately 400 feet southeasterly of the southeast corner of the Champagne property. In June, 1993, the property now belonging to Williams was the property of a trust created by the will of Annette W. Collens, for which Fleet Bank was the trustee.
In October, 1993, the Champagnes and Fleet Bank as trustee entered into an agreement entitled "Boundary Line Agreement", since entered in the Granby Land Records. This agreement settled an apparent uncertainty as to the common boundary. It also conveyed to the Champagnes an easement and the right to construct a roadway from the existing end of Moosehorn Road into the Champagne property and contemplated a cul-de-sac just within the Champagne property. Champagne agreed to build the extension of Moosehorn Road according to town specifications and to "cause the same to be accepted [by the town of Granby] as part of said Moosehorn Road." The extension was to be built "substantially within the bed of the now discontinued portion of Moosehorn Road" and was to coincide substantially with the proposed extension shown on the boundary line map which was filed on the land records. The roadwork and the acceptance by the town were to take place within one year from the date of the agreement. The Champagnes agreed to indemnify and hold harmless the trust for any claims arising out of any work done on the roadway.
Champagne set to work on the project of extending the road with some heavy equipment; he performed much of the work himself. Although the land was cleared and graded to a degree, the road was never paved or accepted by the town. A series of correspondence between Champagne and town officials shows that the town was interested in a means of turning around at the end of the road. A letter from the town manager dated September 29, 1994, indicates that the project was intended to be recommended for the process of acceptance as a town road as soon as "the survey and deeds are in order." According to both Champagne and Francis Armentano, Granby's director of community development, the town at this time became more rigorous in its insistence that public roads meet more stringent requirements, and the extension of Moosehorn Road was not accepted by the town nor completed by Champagne.[3]
So matters stayed until 1996. Williams at that point was negotiating with the beneficiaries of the trust to purchase the property adjacent to Champagne's parcel. Williams wanted to extend Moosehorn Road, as did Champagne, because Williams wanted to open up more of his parcel, or what was to become his parcel, for development. On July 23, 1996, Champagne and Williams entered into a written agreement, drafted mostly by Williams CT Page 16089 but with contributions from Champagne, which confirmed the prior boundary line agreement between Champagne and the trust and stated the extension and the cul-de-sac as defined in that agreement will be dedicated as a town road. The Champagnes agreed not to oppose Williams' plan to subdivide the property and Williams agreed to "cause the extension of Moosehorn Road including the cul-de-sac as defined in the Boundary Agreement and the Map[4] entitled `Extension of Moosehorn Road' by Sanderson and Washburn dated January 1994 to be paved, accepted and dedicated by the Town of Granby as a public road by September 30, 1997." Both Williams and Champagne agreed to use due diligence to complete the extension and both pledged $5,000.00 toward that end. The duties to indemnify and save harmless were transferred to Williams. D.H. Williams, Inc., received title to the parcels previously owned by the trust on October 1, 1996.
Champagne never opposed any of Williams' proposals regarding the subdivision. Williams' plans for the extension of Moosehorn Road into Champagne's property hit some significant snags, however. When Williams presented his subdivision plans to town officials, including the planning and zoning commission, which plans included the extension of Moosehorn Road as contemplated on the referenced map, he received preliminary indications that the commission would not approve the plan insofar as it incorporated plans to extend Moosehorn Road into Champagne's property. The reason, which is supported by detailed plans showing the slope or grade of the land, is that the grade of the proposed Moosehorn Road becomes very steep as it approaches and enters Champagne's land. The town apparently allowed a 10% grade, and could waive up to a 12% grade, but portions of the proposed roadway included grades of 13% and 14%. When it became clear to Williams that the proposal would not be approved by the town, and the proposed extension of Moosehorn Road would not be accepted by the town, he withdrew the application on August 26, 1997. Williams subsequently received approval to extend Moosehorn Road most of the way to the Champagne property, and the roadway has in fact been extended, but there remains approximately a gap of approximately forty feet between the cul-desac and the boundary line between the properties. Champagne's property, then, still has no access to a town road.
After the plan to extend the roadway into Champagne's property was withdrawn, Champagne and Williams continued their dialogue, sometimes with the participation of Armentano. Various proposals were discussed. One proposal contemplated the conveyance, by Williams to Champagne, of a section of land which includes a strip between the existing cul-de-sac and Champagne's parcel such that Champagne would have access to the town road. The parcel is reflected on one map, with a revision date of November 30, 1998, which parcel is labeled "lot to be conveyed to Roy E. Champagne = 56,719 sq. ft. = 1.30 ac." The map has been entered into CT Page 16090 evidence as Plaintiff's Exhibit 5. Evidence regarding the "lot to be conveyed" was disputed at trial. Champagne claimed, essentially, that the conveyance of the lot was specifically and finally agreed upon as the substitute performance for the inability to extend Moosehorn Road into Champagne's property. Williams contended that the parcel was so labeled on the map simply to show one proposal which was contingent upon his receiving some consideration from Champagne: Williams testified that one proposed "swap" involved the transfer on the identified lot to Champagne in return for a triangle of Champagne's land, identified on Defendant's Exhibits C and J. The triangle would apparently allow easier access from the existing end of Moosehorn Road to other land of Williams.[5]
Williams testified that Champagne did not want to part with the triangle of land and that he (Williams) did not feel obligated to give Champagne something for nothing.
Currently, then, Champagne has no access to a town road. Williams has completed houses on a number of the lots in his subdivision, and there apparently is a limit of approximately twenty-five houses which can be served by a dead-end road, pursuant to Granby authorities.
Champagne has brought a complaint in six counts. The first count alleges some of the background information and specifically alleges that the parties entered into the July 23, 1996, agreement whereby Champagne agreed not to oppose Williams' subdivision plans and Williams agreed to cause the extension of Moosehorn Road to be completed to the Champagne parcel and to have the extension accepted by the town. The count alleges that Champagne performed his contractual obligation, but Williams did not, and that as a result of his breach, the plaintiffs' parcel is worth less money than otherwise. The second count largely incorporates the allegations of the first count and alleges that Williams was acting as the alter ego of D.H. Williams, Inc. The third count alleges that after the first contract was breached, Williams agreed to convey the parcel of land referred to above, which parcel would connect Champagne's land to the cul-de-sac and that Champagne continued not to oppose Williams' subdivision plans. By refusing to convey the parcel, it is alleged that Williams breached the contract and the plaintiffs have been harmed. The fourth count echoes the third count, and claims again that Williams was acting as the alter ego of the corporation. The fifth count alleges that in September, 1999, the corporation trespassed on land owned by Champagne and cut trees and removed and graded soil. The sixth count alleges that because the corporation was the alter ego of Williams, Williams is liable for the transgressions related in Count Five. The plaintiffs requested relief in the form of money damages, orders requiring specific performance of the agreements, a decree vesting title to the lot to be conveyed, an injunction prohibiting any conveyance or encumbrance of any of the land included in the parcels conveyed to Williams by the trust, an CT Page 16091 injunction prohibiting Williams from seeking approval from any governmental authority for any additional building lots, an injunction prohibiting further entry on the Champagne land, an injunction ordering restoration of the Champagne property to the condition it was in prior to the tree and soil disturbance, and treble damages for trees and shrubbery removal pursuant to § 52-260 of the General Statutes. The defendants pleaded a number of special defenses, which will be considered as necessary, and also pleaded a counterclaim.
First, the counts involving the "alter ego" theory, claiming substantial identity between Williams and D.H. Williams, were rendered insignificant at trial. Counsel for both defendant entities stated that there was no claim that one of the entities had no obligation because of any representation or agreement made by the other. That is, no advantage is sought as a result of intermingling of identity. The defendants agreed that if any remedy were ordered as to either the individual or the corporation, the remedy would not be contested on the ground that the obligation, if any, was that of the other party. Because the remedies regarding corporate veils and alter egos are, as a rule, designed to correct injustices where obligations are inequitably sought to be avoided by the construction of fictional devices, and no such advantage is sought here, I will for the purposes of this opinion treat Williams and the corporation as one and will usually refer only to "Williams".
The first issue, then, is the resolution of the first count, which alleges that Williams breached the contract of July 23, 1996, between Champage and Williams. It will be recalled that the contract, entered into evidence as Plaintiff's Exhibit 4, provided that Champagne would not oppose Williams' plans for a subdivision, and Williams in turn would extend Moosehorn Road, including the cul-de-sace, into Champagne's property as defined on a specified map and would "cause" it to be "paved, accepted and dedicated by the Town of Granby as a public road by September 30, 1997." Champagne has claimed that he performed the agreement and Williams did not, because he did not cause the extension to be so paved, accepted and dedicated.[6]
As Champagne has argued, it is clear that the primary objective for him, both as to this agreement and the course of the ongoing negotiations, has been the creation of access to his property by an accepted town road. Obviously there are many clear benefits to the objective. The evidence shows, and I so find, that Williams made every reasonable effort to uphold his part of the bargain. Detailed engineering plans, which presumably were prepared for Williams at some significant expense, were submitted to the town authorities in support of the proposal to so extend the roadway. For any one of several reasons, or a combination of reasons, the authorites ultimately made it clear that the CT Page 16092 plans would not be approved. It may be that the parties at the time of the agreement were not aware of the precise steepness of the grade as it approached and penetrated the Champagne boundary, and/or it may be that the culture and practice of the town authorities became somewhat more strict at about the time in question. In any event, the inability to complete the extension of Moosehorn Road as contemplated in the map specifically referenced, and indeed in every map submitted into evidence, was not caused by Williams. It was beyond the ability of the parties to perform the material terms of the contract as they related to the extension of Moosehorn Road into the Champagne parcel. I also find that at the time the agreement was reached, both sides contemplated that it would be possible to perform the terms.
The language and reasoning of Anderson v. Yoaworski, 120 Conn. 390,396-98 (1935), are particularly germane. In Anderson, the parties had agreed to convey a parcel of real estate that contained buildings. Between the time that the contract was executed and the time of the closing, at least one of the buildings burned down. The object of the contract, then, was substantially destroyed; it had been found that the destruction occurred without the fault of either party. Chief Justice Maltbie held that the underlying assumption of the parties was that undamaged property would be conveyed, and the contract was then subject to the implied condition that if the object were unable to be accomplished, the parties were excused of performance:
 That rule has been stated by us as follows: "Where, from the nature of the contract and the surrounding circumstances, the parties from the beginning must have known that it could not be fulfilled unless, when the time for fulfillment arrived, some particular thing or condition of things continued to exist, so that they must be deemed, when entering into the contract, to have contemplated such continuing existence as the foundation of what was to be done; in the absence of any express or implied warranty that such thing or condition of things shall exist, the contract is to be considered as subject to an implied condition that the parties shall be excused, in case, before breach, performance becomes impossible or the purpose of the contract frustrated from such thing or condition ceasing to exist without default of either of the parties." Straus v. Kazemekas, 100 Conn. 581, 591, 124 A. 234; see Fischer v. Kennedy, 106 Conn. 484, 490, 138 A. 503. We can find no sufficient reason for not applying the same rule to contracts for the sale of real estate. In the latter as much as in those for the sale of personal property, the CT Page 16093 intention of the parties is that, when the time for performance is reached, the property bargained for shall pass; that intention is just as much frustrated in the one case as in the other by the destruction of the essential value of the property before the day of performance comes; and there is the same reason to imply as a condition of an obligation to perform the contract, that value should continue to exist. Thompson v. Gould, 37 Mass. (20 Pick.) 134, 139; Gould v. Murch, 70 Me. 288. Anderson v. Yaworski, 120 Conn. 390, 396-97 (1935).
Following the rule of Anderson, then, I find there was no breach, and paragraph 11 of the complaint has not been proved.[7] In his brief, the plaintiff has argued that Williams perhaps could have performed the essence of the agreement by constructing a switchback or other configuration to reach the Champagne parcel. It is clear from the terms of the agreement, however, that the extension was to be that which was drawn on the maps, and any substantial deviation would have been beyond that agreed to by the parties. There was also no evidence submitted as to the feasibility of any such alternate compliance.
The second question, then, is whether the parties entered into a second agreement as to the conveyance of a parcel of land from Williams to Champagne such that Champagne would have access to the cul-de-sac as it ultimately was constructed. Champagne seems to suggest two related theories to support the second agreement: that it is really only a substitute way to perform the first agreement, so that it needs no further consideration, and also, apparently, that Champagne provided the continuing consideration of not objecting to subdivision plans.
Either way, any possible agreement cannot be enforced because of the Statute of Frauds, § 52-550 of the General Statutes.[8] The July 23 agreement did not purport to convey any land, and certainly did not convey the parcel in question. In support of the proposition that the statute was satisfied by the alleged handshake, the plaintiff argues that the map[9] on which the "lot to be conveyed to [Champagne]" is a writing and that it is signed by the surveyor, and thus the statute is satisfied.
Section 52-550 states that "[n]o civil action may be maintained in the following cases unless the agreement, or a memorandum of the agreement, is made in writing and signed by the party, or the agent for the party, to be charged: . . . (4) upon any agreement for the sale of real property or any interest in or concerning real property. . . ." Even if the map constitutes such a memorandum, which issue I do not decide, there is no evidence that it is signed by an agent. The map does carry the signature of Martin Post, apparently a surveyor. But there is absolutely no CT Page 16094 evidence that the surveyor was the agent of the defendant for the purpose of conveying land, and I will not make that inference without more evidence. I find, then, that the third and fourth counts of the complaint are not proved.
The fifth and sixth counts have alleged trespass, the cutting of trees and the spoliation of soil. Evidence was introduced to the effect that in September, 1999, one Ron Cranoski was cutting and clearing trees at the new cul-de-sac close to the boundary line between the properties of Williams and Champagne. Champagne was present, at least at one point during the work, and Cranoski offered to cut trees for Champagne while he was there. Champagne apparently declined the offer. Cranoski was not precisely sure where the boundary line was. In any event, Cranoski cut trees without objection from Champagne, and Champagne knew which trees Cranoski was cutting. Some of the trees, as it turns out, were on Champagne's land. According to Cranoski, the only value of the trees would be for firewood. He thinks he cut perhaps a cord and a half, and the wholesale value was about ten dollars per cord. On these facts, I do not find an actionable trespass or any damages for treble damages for cutting trees in violation of § 52-560 of the General Statutes.
There also was a claim in the fifth and sixth counts regarding the grading of land within the Champagne parcel. At approximately the same time as the tree-cutting episode, Williams arranged for the grading of land in the area of the cul-de-sac. The plaintiff withdrew a claim for damages as a result of the grading; I do not find it necessary to find one way or the other whether any trespass occurred on the land of Champagne as a result. I also decline the injunctive relief requested as to encroachment of the land of Champagne. There was no evidence of any continuing trespass or any imminent probability of trespass. I find, then, that the allegations of the complaint have not been proven.
The defendant has filed a counterclaim which seeks injunctive relief and damages against Champagne on several theories. The first count is an action to quiet title, and the fourth count seeks discharge of the lis pendens filed by the plaintiff in support of this action. In light of the disposition of the complaint, additional relief to quiet title is not necessary. The boundary line agreement entered into between Champagne and Williams' predecessors in title resolves any dispute as to ownership of any land. The lis pendens recorded in Volume 237, Page 32 is ordered discharged.
The second count of the counterclaim alleges that Champagne breached his agreement with Fleet Bank as Trustee because he did not extend Moosehorn Road as contemplated and "cause the same to be accepted . . ." and that Williams is a successor to the trustee. The short answer is that CT Page 16095 although Champagne did some work on the road, he encountered difficulties with approval of the same nature as Williams did several years later, and, in any event, the parties entered into the July 23, 1996, agreement on the same subject matter and I find that the parties intended to substitute the second agreement for the first. Venerable authority supports the
proposition:
 As a general rule, when the new contract is in regard to the same matter and has the same scope as the earlier contract and the terms of the two are inconsistent either in whole or in a substantial part, so that they cannot subsist together, the new contract abrogates the earlier one in toto and takes its place, even though there is no express agreement that the new contract shall have that effect.
 Riverside Coal Co. v. American Coal Co., 107 Conn. 40 (1927).
The allegations of the second count of the counterclaim, then, are not proved, and the same reasoning applies to the third count, which claims indemnification arising from the contract between Fleet Bank and Champagne.
The fifth and sixth counts allege slander of title. Williams claims that the "publication" and recording of the lis pendens in this action, which apparently was placed on both parcels, constituted a slander of title. The elements of slander of title are as follows:
 "A cause of action for slander of title consists of the uttering or publication of a false statement derogatory to the plaintiff's title, with malice, causing special damages as a result of diminished value of the plaintiff's property in the eyes of third parties. The publication must be false, and the plaintiff must have an estate or interest in the property slandered. Pecuniary damages must be shown in order to prevail on such a claim." 50 Am.Jur.2d, Libel and Slander § 554 (1995); see also Frank Mercede Sons v. Tischler Und Sohn, Superior Court, judicial district of Stamford-Norwalk, Docket No. 172470 (December 2, 1999).
 Elm Street Builders v. Enterprise Park Condominium, 63 Conn. App. 657
(2001). CT Page 16096
There ordinarily is at least a conditional, and perhaps an absolute privilege for statements contained in lis pendens. Purpora Associates v.Keefe, 1998 Ct. Sup. 15095 (Blue, J.) (1998). I find that the statements made in the lis pendens were made in good faith and, strictly speaking, the statements were not false, in that an action, to wit, this action, had in fact been brought on the grounds stated in the lis pendens.[10]
The defendant never sought to discharge the lis pendens and never showed specific monetary damage. The fifth and sixth counts are not proved.
Finally, the defendant has alleged damages pursuant to the Connecticut Unfair Trade Practices Act, §§ 42-110a et seq. of the General Statutes. This claim has not been specifically briefed or argued and I find no merit to the claim.
Judgment may enter for the defendants on the complaint and for the plaintiffs on the counterclaim.
Beach, J.